**THOMSON et al. v. UNION CASTLE MAIL S. S. CO., Limited, et al.**

(Circuit Court, S. D. New York. January 16, 1907.)

1. MONOPOLIES—COMBINATION AMONG SHIPOWNERS—REASONABLE RESTRAINT.
    Where a combination of foreign shipowners engaged in South African trade allowed certain rebates to New York shippers who patronized the ships belonging to the combined owners exclusively, such arrangement constituted only a partial and reasonable restraint on foreign commerce, and was therefore not unlawful at common law.

2. SAME—SHERMAN ANTI-TRUST LAW—RECOVERY OF TREBLE DAMAGES.
    Foreign shipowners formed a combination abroad to organize and control steamship business between New York and South African ports, after which plaintiffs, who had never before been engaged in South African trade, began to ship goods to such ports, and in common with other patrons of defendant's vessels, became entitled to rebates under a circular issued by defendants in case plaintiffs did not patronize competing vessels, which they afterwards did, whereupon defendants refused to pay further rebates. *Held*, that plaintiff's right to such rebates, if any, was not an item of damage that proximately grew out of the combination of shipowners, and hence plaintiffs were not entitled to recover the same under Sherman anti-trust act (Act Cong. July 2, 1890, c. 647, § 7, 26 Stat. 210 [U. S. Comp. St. 1901, p. 3202]), authorizing a recovery of treble damages accruing through an unlawful combination in restraint of interstate and foreign commerce.

## At Law.

This action for treble damages, under section 7 of the Sherman act (Act July 2, 1890, c. 647, 26 Stat. 210 [U. S. Comp. St. 1901, p 3202]), came on for trial before Hough, District Judge, and a jury. The defendants named in the complaint consisted of several British shipowners, one German shipowner, and their several American agents. It was alleged that the defendants had formed a combination and a monopoly in restraint of foreign commerce of the United States between the port of New York and the divers ports of South Africa, and that such combination and monopoly had injured the plaintiffs, especially in the sum of £1,112. There was also a prayer for general damages. During the trial the action was discontinued as against the German shipowner and continued without amendment of the pleadings against the British shipowners. It appeared that steamship trade between New York and South Africa began in the year 1893. It was originated by one of the defendants. Within a month or so of the dispatching of the first steamer another of the defendants put a steamship on berth in New York for the same ports. There was some evidence that for the space of from one to three months there had possibly been competition between these two defendants; but certainly from that time, and possibly from the beginning, the defendants thereafter operated their steamships in union, pursuant to arrangements made in England and authoritatively communicated to their New York agents. They charged uniform rates of freight, and arranged the dispatch of their steamers so as not to interfere with each other. In 1898 all the British defendants by a joint circular announced to the trade that those shippers who sent all their South African goods by defendants' steamers, and who shipped said goods to South African consignees, who during certain periods had received no goods from the United States by vessels other than those of the defendants, would be entitled to receive a commission, rebate, or return of a certain percentage of the freight moneys demanded by the announced or tariff rates of the defendants between the United States and South African ports. At the time of the issuance of this circular the plaintiffs had never been engaged in South African business. They made their first shipment to that region in 1899 by the line of one of the defendants, and thereafter until their quarrel with the defendants pursued that practice. During the year 1900 difficulties arose between plaintiffs and defendants or some of them in respect of the payment of these rebates. Defend-

ants claimed that either the plaintiffs or their consignees had patronized other lines than those of defendants, and that, therefore, they were not entitled to the rebates demanded. The amount of the rebates so withheld by the defendants or some of them is the £1,112 above specified. As a result of these differences of opinion and withholding of rebates, the plaintiffs were put to certain other expenses in their endeavors to collect said £1,112. This action was brought in June, 1903, and declares that the combination and monopoly existed, and plaintiffs' damages were received during 1899, 1900–02, and so on to June, 1903. During that time other steamers from time to time endeavored to get South African business in New York. When such steamer appeared, the defendants or one of them put on berth what they called a "fighting steamer"— i. e., a vessel for which freight would be accepted at rates as low or lower than those offered by the competing vessel—and the capacity of the fighting steamer was as far as possible allotted to and between those shippers who had in the past confined their South African patronage to defendants. The plaintiffs complained that they were not given upon these fighting steamers opportunity of sending all, or, indeed, any large part, of the goods which at the time they had in hand to send, but it appeared that they were given as large a fraction of the fighting steamer's capacity at cut rates as were other shippers similarly situated. These facts having been made to appear upon the examination and cross-examination of the plaintiffs' witnesses, defendants moved to dismiss the complaint.

Dr. Lorenzo Ullo, for plaintiffs.

Convers & Kirlin and Wing, Putnam & Burlingham (Mr. Thacher, of counsel), for defendants.

HOUGH, District Judge (orally). I feel that the court must decide this case. It is unfortunate that the first legal proceeding to test the applicability of the Sherman anti-trust law to foreign commerce should have been brought under the seventh section of the act, because it perhaps prevents laying a foundation for a really illuminating discussion on that aspect of the statute. If this case had been promoted by the United States, or even by a shipowner who, by the combined action of the defendants, had been prevented from freely engaging in commerce between New York and South Africa, I think very different questions would have been presented for consideration; but these plaintiffs can only recover if able to show that they have been injured in their business or property by any other person or corporation by reason of anything forbidden or declared to be unlawful by the Sherman act. By the common law it is my opinion that restraint of trade or commerce, if partial and reasonable, is lawful; and that doctrine, as applied to the peculiarities and requirements of the steamship trade, I have always thought was fully, ably, and correctly stated in the case of the Mogul Steamship Company. Viewing it as matter of common law, it is my opinion that the trade regulations shown in this case are reasonable in theory or principle, though, perhaps, unwisely interpreted in practice; but I do not think that the general question as to whether reasonable regulations of foreign or interstate commerce are obnoxious to the Sherman act requires consideration in this litigation.

The action as against the Hansa Line and its agents having been discontinued, it appears to me that all the defendants who are left in the case engaged in the steamship business between the United States and South Africa in substantial union. All the defendants are foreign shipowners, except the resident agents of those foreigners, who

are merely mouthpieces of their principals, and themselves made no combination whatever except in respect of their own commisions —something obviously not within the purview of the act. Since the foreign steamship lines here concerned agreed upon their concerted action in their home country, and engaged in substantial union in the business of transportation by steam between New York and South Africa from the very beginning, then all the defendants' American and South African steamship trade has been done, as it appears to me to have been done, subject to these foreign made regulations. Under such circumstances I find it impossible to believe that a statute designed to prevent a restraint of existing trade can apply to the conditions under which the trade was born. In the original formation of the defendants' union, therefore, I find no infraction of any federal law; and it remains to consider only whether the action of the defendants in putting on what have been called "fighting steamers" constituted something that converted a lawful union into an unlawful one. It seems to me that the fighting steamers, so far from restraining commerce and stifling competition, in and of themselves constituted a very violent competition. The well-known fact that competition carried to its uttermost destroys itself seems to me nothing to the point so far as the Sherman act is concerned, the supreme test of the application of which act has frequently been held to be the stifling of competition to the detriment of the particular commerce concerned.

Now, these plaintiffs began to ship their goods and to ship other people's goods to South Africa long after the only combination shown was made, and I believe made abroad. What South African business the plaintiffs had was created in conjunction with the defendants' combination. The combination injured neither the business nor the property of the plaintiffs, except by possibly depriving them of greater profits than they might have made had the defendants chosen to enter upon American business under other conditions. They were not obliged to enter upon American business at all.

What the plaintiffs are really seeking to recover are the rebates due to those persons who gave their whole business to the defendants. This right to rebate rested on contract, a contract embodied in the fact of shipment evidenced by the usual documents. That contract was not in itself unlawful. If the union of the defendants was not of itself unlawful, each defendant could have made the same contract individually which they made unitedly, could have announced the same contractual purposes, and carried them out. It may be that the action of the steamship companies in withholding the rebates claimed by the plaintiffs was unjustifiable; but the plaintiffs must in this case, and under this pleading, prove that their loss was proximately caused by a violation of the Sherman act. Even if the organization of a new line of foreign commerce, arranged in London to connect the United States with a foreign country, be obnoxious to the Sherman act, though the commerce alleged to be restrained existed prior to the alleged restraint only in posse, it must remain true that whatever may be the rights of the federal government as against such obnoxious combination no private person can recover damages against the members of the

combination except such as naturally flow from and are proximately caused by the action of the combination.

These plaintiffs have admitted that they have but one substantial claim of injury from which all their other damages flow, namely, that after they agreed, perhaps unwillingly, to the trade terms of the combination, and by so agreeing obtained and developed trade which they never had before, that then the defendants so interpreted the bargain which they had obtained from the plaintiffs as to deprive the latter of an advantage which the plaintiffs supposed they got by practically going into the combination themselves. Now, this may give plaintiffs a good cause of action upon the contract, or for deceit in not having communicated to them the singular fact that disloyalty of a consignee over whom they could have no control would deprive them of the reward of their own fidelity; but it is not an item of damage that proximately grows out of the combination, even if such combination was in restraint of foreign commerce.

The motion to dismiss the complaint is therefore granted.